PeaesoN, C. J.
 

 1. The plaintiff is not entitled to a specific performance of that part of the agreement executed by him and Richard Smith, on 21st of January, 1843, in which it is stipulated that if either party should wish to sell, he shall give the other “ the refusal,” or what was aptly called, on the the argument, “ the right of pre-emption.”
 

 We are inclined to the opinion, that a court of equity would not have interfered to compel a specific performance between the
 
 original parties.
 
 Such stipulations are against public policy, and operate in restraint of alienation; for which reason, they are not favorites, either in courts of law or courts of equity. At law, an understanding of this nature is not treated as a grant of an easement or privilege, or as a condition, so as to be attached to the land, in respect to which it is made,' but merely as a collateral personal covenant, for a breach of which, the party may be entitled to an action for damages;
 
 Blownt
 
 v.
 
 Harvey,
 
 6 Jones’ Rep. 186;
 
 Keppel
 
 v. Bailey, 2 Mylne and Keene, 577, where it is said, £t incidents of a now
 
 *128
 
 el kind cannot be attached to property at the fancy or caprice of any owner,” because “it is clearly inconvenient to the science of the law, that such a latitude should be given “ great detriment would arise, and much confusion of rights, if parties were allowed to invent new modes of holding and enjoying real property, and to impress on their lands a peculiar character, which would follow them into all hands, however remote.”
 

 Considerations of this kind apply as forcibly in equity as at law; consequently, the Court should not treat such agreements as creating a trust, binding the parties and privies to a specific performance, but should leave the party aggrieved by breach thereof, to his remedy at law. If one takes land in fee simple, and covenants not to alien, a court of equity will not interfere by injunction to prevent him from doing so, but will leave the party to his remedy at law. This is clear. The covenant under consideration is, in effect, a modified agreement not to alien, and falls under the like reason.
 

 We are also inclined to the opinion, that the effect of the sale by Weisman to ITepburn, with the concurrence of Smith, of one half of his interest in the lands, and of the deed executed by Smith to Weisman and Hepburn, vesting in them, as tenants in common, the legal right to one undivided moiety of the lands, made such a change in the relation of the parties, as to annul and supercede the stipulation which had been made between Weisman and Smith, in respect to the right of pre-emption. It was based on the footing of the copartnership, and was an emanation of the, idea entertained by the parties of a “grand monopoly” in respect to the mines, which suggested that if one of the parties should ever wish “ to withdraw from the said concern,” it was highly probable that the other party would desire to become the owner of
 
 the whole,
 
 and the stipulation was made to enable him to possess himself of the monopoly. The firm, which was known under the name and style of “Smith and Weisman,” was dissolved by the transactions above referred to, and it is fair to infer that the- idea of a monopoly was abandoned and passed away
 
 *129
 
 when the firm ceased to exist; for no allusion is made to this stipulation in Smith’s deed, and Hepburn is not required to become a party to it, although he acquired one-fourth of the land as a tenant, in common. All mutuality was in this way destroyed, and the fulfilment of the stipulation, was, in fact, rendered impracticable. Was Weisman, owning one-fourth, entitled to a pre-emption right in respect to the whole of Smith’s half? Or only to one-half of that half? Did Weis-man communicate to Hepburn an interest in the pre-emption, so as to give him the right as to one-fourth, both in respect to Smith and Weisman? Was Smith bound to offer the refusal to Weisman alone ? • Or to Weisman and Hepburn jointly? Orto them severally, each one-fourth?
 
 And,per
 
 contra, had Smith a pre-emption right as against Weisman alone, or Weisman and Hepburn jointly? Or the two severally ? The parties have not enabled the Court to answer these questions. The absence of any provision for this new state of things raises a presumption that the stipulation in question was treated and considered by all parties as being defunct.
 

 We are of opinion, that upon the death of Mr. Smith, the stipulation did not follow the land and bind his de^sees in respect to it, so as to entitle the plaintiff to enforce it against them or their assignees. It could only have this effect by giving to it the character
 
 of a trust.
 
 We can conceive of no ground to clothe it with this character. On the contrary, the considerations above suggested, tend to show that the Court would not allow it to be so treated, except as between the original parties, even if an intention to make it a trust, had been expressed by the terms of the agreement.
 

 The clause, whereby the parties “bind themselves, their heirs, executors, administrators and assigns, to the strict observance of this article,” has no further effect than the same words added to a bond for the payment of money. It may be that the plaintiff can maintain an action at law against the personal representatives of Smith or his real representatives— that is, his devisees, for breach of this covenant, but there is no ground on which he can treat a purchaser as holding in trust
 
 *130
 
 for him; because no trust was created in his favor by the original agreement.
 

 2. The plaintiff is entitled to a declaration in the decree, that he owns one-fourth of the legal and equitable estate in all the lands set out in the deed executed by Smith to Weis-man and Hepburn, 1st of February, 1850, free from an in-cumbrance or lien, by reason of the mortgage executed by himself and Hepburn to Smith, and to a further declaration that the mortgage debt has been satisfied, and to a decree for a reconveyance. This equity was yielded by the defendants on the argument, except as to four acres of land which, it is alleged are given to the church, and four acres on which the mill is situated. In respect to which they allege a cross equity to have a specific performance of an agreement to convey the same to Smith, executed by Weisman and Hepburn.— Whether the defendants will be able to establish the cross equity, or whether it can be met by the plaintiff on the ground that it was obtained without consideration,, and by the undue exercise of the influence which Smith held over them
 
 by
 
 reason of his being a creditor, and having them in h-is power, or will,%t all events, be allowed only to the extent of giving a lien on the mill as a security for the amount expended by Smith in the erection of the mill, are questions into which we will not now enter, because they are not presented in a proper manner by the pleadings. Where the defendant has an equity, he must set it up by a cross bill. This is a well settled rule of the court. The decree, however, in this case will be so framed as to be without prej udice to this equity of the defendants, so as to enable them, if so advised, to seek to have it set up by an original bill, when the matter can be fully presented without being attended by the complication and confusion that a cross bill filed in this case would necessarily have produced, considering the very voluminous pleadings and exhibits relevant to the several equities which the plaintiff seeks to enforce.
 

 3. The plaintiff’s right to an account against the personal representatives of Smith, is barred by the statute of limita
 
 *131
 
 tions. It is true, that as between copartners and tenants in common, the statute of limitations does not run, until, as Henderson, C. J. expresses it in
 
 Wagstaff
 
 v.
 
 Smith,
 
 2 Dev. Eq. 264, “ there is a
 
 cesser
 
 of the privity or connection from which the accountability arises.” In that case, and in
 
 Northcott
 
 v. Casper, 6 Ired. Eq. 303, the relation of the parties was not changed, but in our case, on the death of Smith, there was a change in the relation of the parties. Smiths of course, could no longer be a copartner, or a tenant in common, and, consequently, an action accrued for or against his personal representatives to have an account of the profits received, which action is barred by the statute; for, although his wife and daughter acquired his estate, as devisees, the estate passed to them as assignees, and the relation, which had previously existed between him and the plaintiff, was of course at an end. So, the right of action in respect to the profits accrued at that time; for there was “a
 
 cesser
 
 of his privity or connection as tenant in common,” a new relation then commenced between him and the devisees, and the case is the same as if one tenant in common sells. That is, a
 
 cesser
 
 of his relation as tenant in common; and a cause of action then accrues to all of the tenants in respect to the arrearages of profits, and a new relation begins between the other tenants and the purchaser.
 

 The bill was filed on 24th, Sept. 1857. Mrs. Smith and Miss Mary sold to Winder 20th of
 
 April,
 
 1854, at which time there was a
 
 cesser
 
 of the connection with the plaintiff as tenant in common. So, the plaintiff’s right to an account against them is barred, except from the 24th of Sept. 1854. Eor all profits or moneys received for, or on account of, or out of the the lands, after that date, he is entitled to an account as against Mrs. Smith and Miss Mary, and the defendant Winder, and the Herron Mining Company. How far the fact that the de-velopements of lead ore cropped out in so many places, and the quantity of wood was so great as to leave ample room for all the tenants in common to come and take their share, distinguishes that species of profits from the receipt of rent, either in money or produce paid by the lessees of the several
 
 *132
 
 bouses, and cleared pieces of ground in the many tracts of land, is a question which may be presented by exception to the account.
 

 Pek Cukiam, Decree accordingly.